AO 91 (Rev. 11/11)   Criminal Complaint

| LODGED |
|---|
| CLERK, U.S. DISTRICT COURT |
| 6/3/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: MMC  DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

| ~~FILED~~ |
|---|
| CLERK, U.S. DISTRICT COURT |
| 6/3/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: VV  DEPUTY |

United States of America )
v. )
VINCENT CHUNG-WING CHOW )
)   Case No.  2:25-MJ-03411-DUTY
)
)
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __June 2, 2025__ in the county of __Los Angeles__ in the
__Central__ District of __California__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Brian Y. Joh, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/3/2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Max A. Shapiro x7419

**AFFIDAVIT**

I, Brian Y. Joh, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrants against Vincent Chung-Wing CHOW ("CHOW"), for a violation of Title 21, United States Code, Section 841(a)(1)(Possession with the Intent to Distribute a Controlled Substance).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3. I have been employed as a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") since October 2023. I am currently assigned to the DEA's Los Angeles Field Division, Southwest Border Group 1 – Strike Force. I have received approximately 17 weeks of specialized training at the DEA Academy in Quantico, Virginia, involving use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques,

and conspiracy investigations.  I have participated in narcotics investigations and have debriefed defendants and witnesses who had personal knowledge of narcotics trafficking organizations.  From June 2017 to August 2021, I was a Marine Corps Officer and served with Marine Air Support Squadron 3 in Camp Pendleton, California.  Following my military service, I worked as an Emergency Medical Technician ("EMT") for Falck Ambulance Company serving the greater Los Angeles Area from December 2022 to June 2023.

      4.  In the course of my employment with the DEA, I have participated in many aspects of narcotics investigations, including conducting physical surveillance, executing search warrants, directing confidential informants, and conducting arrests.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection and laundering of drug trafficking proceeds.  I am also familiar with methods employed by drug traffickers and large-scale drug trafficking organizations to impede detection by law enforcement, including the use of coded language, counter-surveillance, multiple vehicles, prepaid or debit calling cards, public telephones, cellular telephone technology, false or fictitious identities, and encoded communications.

### III. STATEMENT OF PROBABLE CAUSE

      5.  Based on my review of relevant documents and communications, my involvement in the investigation,

conversations with other law enforcement agents, and my training and experience, I am aware of the following:

### A. 1084, LATER IDENTIFIED AS CHOW, COMMUNICATED WITH CS REGARDING THE SALE OF METHAMPHETAMINE AND OTHER DRUGS.

6. On or about May 5, 2025, a DEA Confidential Source ("CS")[1] was contacted on Signal by an unknown individual with username "1084." Based on my review of the Signal communications, I know the following is an excerpt of the Signal communications between 1084 and the CS:

| 1084 | The snow |
|------|----------|
| 1084 | Met you at the barbershop first time remember? |
| 1084 | Lmk if you need anymore |
| 1084 | Met you inside the barbershop |
| CS | Yo what's good fam |
| CS | Yeaaa I remember |
| 1084 | You need any squarws |
| 1084 | E, molly or K? |
| 1084 | Or Addy? |
| CS | Yea |

---

[1] The CS is currently awaiting federal indictment for violations of 21 U.S.C. §§ 846 and 841, and is cooperating in hopes of a sentence reduction. Based on my review of the CS' criminal history, I understand that the CS does not have any prior federal or state convictions, but has a pending state robbery charge in Nevada. The CS is not being paid for information. Based on my personal involvement in this investigation and conversations with other law enforcement officers, I understand that law enforcement has been able to corroborate the information the CS has provided throughout the investigation, and has deemed him/her to be credible and reliable.

| | |
|---|---|
| CS | Square and glass |
| 1084 | How many squares you need? |
| 1084 | And how many waters? |

7. During the message exchange between 1084 and the CS, 1084 referenced a barbershop during their first meet. Based on conversations with the CS, I know when 1084 referenced "the first time," 1084 was talking about the first time 1084 sold drugs to the CS. When law enforcement asked the CS to describe who he/she previously purchased drugs from in a barbershop, the CS stated the individual that sold him/her drugs was an Asian male.

8. Later during the Signal conversation, 1084 offered the CS a variety of drugs. In return, the CS told 1084 he/she needs "Square and glass," which based on my training and experience and conversations with the CS I understand was a reference to cocaine and methamphetamine. Specifically, based on my training and experience and conversations with the CS, "squares" was a reference to cocaine, which are commonly packed in square or rectangular brick shapes, and "glass" was a reference to methamphetamine, which can often have a glass-like appearance.

9. On or about May 7, 2025, the CS sent a message to 1084 on Signal inquiring if 1084 was going to be in town. 1084 responded to the CS's message stating "Might be," and asked what the CS needed. The CS told 1084 he/she had a (fictitious) client flying in the next day, Thursday May 8, 2025, and his/her client was looking for methamphetamine. The CS then proceeded

4

to tell 1084 the fictitious customer had previously received poor quality methamphetamine.  In the subsequent messages, 1084 and the CS agreed to $800 per pound for methamphetamine if purchased in bulk quantities.  The CS then told 1084 his/her fictitious customer would grab 30 pounds of methamphetamine "but he gotta test it out."  In response to the CS's message, 1084 reassured the CS by saying "It's goma.be real lok"; shortly thereafter 1084 corrected his typo by saying "Gona."

      **B.**    **1084 AND CS SET UP A DEAL FOR THIRTY POUNDS OF METHAMPHETAMINE.**

      10.  Between on or about May 11, 2025, and May 16, 2025, the CS and 1084 attempted to setup a deal for thirty pounds of methamphetamine.  The deal fell through because 1084 was not able to procure the thirty pounds of methamphetamine before leaving for Las Vegas, Nevada.  In conversations with the CS, 1084 stated he had left town to sell pills in Las Vegas for a music festival.[2]

      11.  On or about May 20, 2025, the CS and 1084 again communicated via messages on Signal.  Based on my review of the Signal communications, I know the following is an excerpt of the Signal communications between 1084 and the CS from that day:

---

[2] While the CS preserved the other Signal messages referenced in this affidavit, 1084 set the messages preferences between 1084 and the CS in this time frame to disappear after 24 hours, so they have not been preserved.  Additionally, when the CS sent the messages from this timeframe to law enforcement, the CS's own messages were set to expire after 24 hours due to an abundance of caution for his/her own personal safety.  Based on my training and experience and conversations with the CS, I understand a Signal user can unilaterally set the deletion terms of a Signal chat.

5

| CS | Lmk when you got the waters ready |
|---|---|
| CS | Ima grab 3 squares too |
| 1084 | Ok |
| 1084 | 30 waters right? |
| CS | Yea |
| 1084 | Ok |
| 1084 | Grabbing your waters now |
| 1084 | You meeting me today for everything? |
| 1084 | Got all the stuff |
| 1084 | You meeting me tomorrow? |

12. Based on my training and experience, and conversations with the CS, I know that when 1084 referred to "30 waters" he was referring to thirty pounds of methamphetamine because drug traffickers will frequently use coded language to evade detection by law enforcement.

13. 1084 then told the CS he was on the way to pick up the thirty pounds of methamphetamine. Once 1084 confirmed that he had picked up the thirty pounds of methamphetamine, he asked the CS multiple times when the CS would be picking up the drugs.

14. Approximately one minute after the CS received the last message in the excerpt above, 1084 called the CS via a Signal audio call to confirm the methamphetamine was in his possession.

15. Between on or about May 27, 2025, and May 30, 2025, the CS and 1084 exchanged several Signal messages in which 1084 told the CS he was going to be around the CS's area and asked if

6

the CS wanted to pick up "waters" (methamphetamine).  1084 and the CS also discussed where and when the deal would take place.

16.  On or about May 31, 2025, the CS received a Signal message from 1084 of an image of what appeared to be sealed bottles of Promethazine with Codeine.  The CS responded, "If it's the real deal ill kop on."  Shortly thereafter, 1084 responded by asking the CS how many he/she wanted.  Based on my training and experience and my conversations with the CS, I understand that by offering the CS prescription codeine, 1084 was advertising himself as a dealer capable of acquiring and selling bulk quantities of a variety of drugs.

### C.   1084 MEETS WITH DEA UC AND LAW ENFORCEMENT IS ABLE TO IDENTITY 1084 AS CHOW.

17.  On or about June 2, 2025, the CS messaged 1084 and stated he/she was on the way.  1084 replied, "OK. 2 bottles 1 unit of e.  The squares and the waters?  All ready."  At approximately 12:06 p.m., 1084 sent a message to the CS with the address of "1220 s diamond bar blvd" and asked for an estimated time of arrival.  When the CS attempted to have 1084 drive to a separate address approximately 5 minutes away, 1084 stated "Naw that's a bad spot."  Law enforcement ultimately positioned themselves at 1220 S. Diamond Bar Blvd, Diamond Bar, CA 91765 in anticipation of 1084's intended drug sale.  At approximately 12:29 p.m., the CS received a message from 1084 indicating he was 5 minutes away.  At approximately 12:36 P.M., investigators observed an Unidentified Asian Male ("UAM") standing in the parking lot in front of Mr. G's Pizza Bar, located at 1220 S

Diamond Bar Blvd, Suite H, Diamond Bar, CA 91765.  The individual appeared to be looking around the parking lot and glancing down at his phone.  Shortly thereafter, a DEA undercover agent (the "UC"), posing as the CS's acquaintance approached UAM and claimed he/she was there on behalf of the CS.  UAM responded by saying the UC was not the individual he was waiting for.  The UC ultimately left the parking lot and told UAM to call the CS.  Based on my conversations with the UC, I know that UAM seemed extremely nervous and was glancing around the parking lot during their interaction.

    18.  At approximately 12:41 P.M., law enforcement observed UAM walk towards a Black Tesla bearing CA license plate 9GNG131 (the "Black Tesla").[3]  Law enforcement then observed UAM enter the Black Tesla.

    19.  Shortly after UAM entered the Black Tesla, law enforcement observed the Black Tesla drive in a loop around the parking lot before stopping at the exit of the parking lot on Diamond Bar Blvd. for a short period of time despite a lack of oncoming traffic.  Law enforcement then observed the Black Tesla enter the left-hand turning lane and remain there while a green turning light cycled.  Based on my training and experience, UAM was conducting counter surveillance in an attempt to identify law enforcement.

---

[3] Based on my review of law enforcement databases, I know that the Black Tesla is registered to CHOW, with an associated address of 1861 W Phillips Dr, Pomona, CA 91766.  Furthermore, a Department of Motor Vehicles ("DMV") database search for CHOW depicted an Asian male with the same associated address.

20. At approximately 12:43 p.m., the CS received a message from 1084 and said "Wtf you do this." In speaking with the CS, the CS explained 1084 anticipated the CS to be at the deal in person and was caught off guard when the CS did not make an appearance.

21. At approximately 12:44 p.m., 1084 sent another message to the CS stating, "He walked to.me and I didn't see where he came from also." At approximately 12:49 p.m., 1084 sent another message to the CS and asked him/her to meet at the barbershop. Based on my training and experience, and conversations with the CS, I know when 1084 referred to the barbershop, 1084 was referencing the barbershop where the CS and 1084 had previously conducted drug deals.

### D. LAW ENFORCEMENT CONDUCTS TRAFFIC STOP OF CHOW'S VEHICLE AND FINDS KILOGRAM QUANTITIES OF METHAMPHETAMINE AND COCAINE, AND OTHER DRUGS.

22. At approximately 12:51 p.m., CHP Officers conducted a traffic stop of the Black Tesla and UAM was taken into custody.

23. Law enforcement then utilized a drug certified K9 to conduct a perimeter sweep of the Black Tesla. During the exterior perimeter sweep of the Black Tesla, the K9 alerted to the right rear passenger side door, and the K9's handling agent opened the door to allow the K9 inside the vehicle. Once inside, the K9 alerted to the rear passenger compartment as well as the trunk of the Black Tesla.

24. During the search of the Black Tesla, law enforcement found approximately 25 brick-shaped objects totaling approximately 31 kilograms, multiple plastic bags of colored

pills totaling approximately 6.6 kilograms, as well as approximately six plastic bags of a crystalline like substance totaling approximately 12 kilograms. Additionally, law enforcement discovered multiple sealed bottles of Promethazine



25. Law enforcement conducted a field test of the brick-shaped objects, plastic bags of colored pills, and the crystalline like substance. The field test kit indicated the substances contained cocaine, methamphetamine, and MDMA ("methylenedioxymethamphetamine").

### E. CS CONFIRMS UAM IS CHOW.

26. On June 2, 2025, law enforcement showed the CS a photograph of UAM taken the same day. The CS stated UAM was the same individual he/she had previously purchased drugs from in the aforementioned barbershop. Additionally, law enforcement showed the CS a DMV photograph of CHOW and the CS stated the depicted individual was the same individual as UAM.

27. Given these facts and based on my training and experience, I believe that signal user 1084, UAM, and Vincent CHOW are all the same individual.

## IV. CONCLUSION

28. For all the reasons described above, there is probable cause to believe that CHOW has committed a violation of Title 21, United States Code, Section 841(a)(1)(Possession with the Intent to Distribute a Controlled Substance).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 3rd day of June
2025.

_____
HON. MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE